Next case on the call of the docket is case number 111378, Enray Mark, Gerard Mulroe, agenda number 7. Counsel? Good morning, your honors. Mr. Mulroe. May it please the court, my name is Stephen Split and I represent the administrator of the Attorney Registration and Disciplinary Commission in these proceedings. The administrator asks this court today to reverse a finding by the hearing and review boards below that respondent's conversion of approximately $115,000 that he was supposed to hold in escrow was not dishonest and also to reject the review board's sanction recommendation, a recommendation of a six-month suspension, and instead suspend respondent from the practice of law for three years. Excuse me. Respondent is a sophisticated investor and a successful businessman with real estate investing. He also has a solo law practice. He testified that 80% of his time was spent in his real estate ventures and 20% in his law practice. In 2004 or 2005, he agreed to represent a friend of his, Adam Fishman, who was getting divorced. After that time, after the trial in the case, the party sold the marital home and the net proceeds of the home were approximately $115,000. Respondent then agreed with Julie Fishman's lawyer. She had discharged her lawyer and the lawyer was holding these accounts at Harris Bank. He had personal bank accounts. He had a number of bank accounts in connection with his various investment businesses like City Investors, KMA, Celtic Management. He also had an operating account for his law firm and an IOLTA account for his law firm. So he had the funds transferred into his IOLTA account on November 3rd of 2005. Within 18 days of that transfer, $40,000 was gone. When he put the money into his IOLTA account, there was $312 in that account. So he put in the $115,000. $40,000 of it was gone in 18 days. Now, Respondent testified that he did not balance any of his accounts. He had a authority through him to transfer money around within his various bank accounts. He testified that his IOLTA account, because he didn't really hold client funds, became a place to, in his words, park money until it was needed for other things. So that's what happened to the funds here. Like I said, $40,000 was gone in 18 days. By February 28th of 2006, four months later, his IOLTA account held $175. Now, the hearing board found in this case that Respondent had converted this money that he was supposed to hold in escrow and that he commingled the money and that he failed to pay the money back in a timely manner because what happened was in August of 2006, after post-trial motions in the case, the judge determined that the entire escrow amount was to be awarded to Julie Fishman. So there was talk about appeals after that time. And what happened was Julie Fishman started sending Respondent letters saying, I need my money. And Respondent didn't respond to those letters. He told his client wanted to take an appeal. He would have to get another lawyer. But the upshot was that Julie Fishman filed a petition for rule to show cause in October and then Respondent paid the fees, paid the escrow money over to her on November 8th, I believe, of 2006 after she had filed the petition. He gave her a post-dated check written on his And in fact, he didn't have the money in any of his Harris Bank accounts. He had to go and get $70,000 from an account at a different bank, an account that he owned with a friend of his, Brian Roland, a friend and business partner. So the hearing... Excuse me, Mr. Spiller. What was the IOLTA account balance status on the date that check was written, the post-dated check? Was there any balance in it at that point? There was some money in it, but the Respondent, when he opened his IOLTA account, he didn't get any checks for the account. So if he ever wanted to move money out of the IOLTA account, he had to transfer it and then write a check. So the check was written on his operating account because that's where he transferred the money into. Now, after the money was down to $175 in February of 2006, there were other monies running through the IOLTA account after that time. I don't know exactly what the balance was of the IOLTA account on the date that he wrote the check, but he needed to get, as I stated, $70,000 from another bank account at a different bank in order to make sure that that check would clear. Now, the Hearing Board found that this was not a dishonest conversion because the Hearing Board said that Respondent did not intend to take the funds from Julie Fishman. In other words, he did not intend to deprive her, to take these funds from her. And therefore, the Hearing Board said this was then a conversion that was caused really by sloppy So we filed our petition for leave to file exceptions in this court. What is our standard of review? Well, it is a manifest weight issue. The finding of dishonesty and the Hearing Board's finding that it should be a question of intent, that's a manifest weight question. If we determine that recklessness satisfies the scienter requirement, isn't that making a determination as a matter of law? Yes. If you choose to look at the issue in that regard, then certainly that is what we like to call a mixed question of law and fact, where the underlying facts are not in dispute. It's a question of whether those facts violate the rule. And that's a mixed question of law and fact, a de novo or clearly erroneous standard of review. It's kind of in flux in front of our review board. But what our contention is, is that the Hearing Board was wrong in saying that this was a sloppy bookkeeping case because there was no bookkeeping. The respondent testified that he didn't balance his accounts. His paralegal testified that she did not balance the accounts. Respondent knew when he put the money into his IOLTA account that his IOLTA account was this place where he parked money and money washed through the IOLTA account and in and out of various accounts. Whenever a respondent needed some money for one of his business ventures, he or his paralegal or his personal banker would determine what account had money in it and then that money was the money that was used. So this was not a situation where a respondent was even attempting to follow what was going on in his accounts and made a mistake. This was a situation where a respondent opened an IOLTA account and didn't do anything to monitor what was going on. So when he agreed with Julie Fishman's other lawyer to take responsibility for these escrow funds and he directed that they be put in his IOLTA account, he knew that once they were in that account, no one was going to know what was going on with those funds because no one balanced the accounts. And he also knew that his IOLTA account, as his other accounts, was just a pass-through and if there was money available and it was needed, it was going to go. And certainly that's borne out by what happened in this case in that $40,000 was gone in 18 days and essentially all of it was gone in four months. So we would like this Court to reverse that finding on the grounds that there doesn't have to be an intent to steal funds by a lawyer in order for conversion to be dishonest. What is your best case for us to abandon the scienter requirement of Rule 8.4? Well, we're not asking you to abandon the scienter requirement. Scienter is nothing more than knowledge of the nature of one's acts or omissions. And our position is that respondent knew. He knew that that happened, but did he actually know that he was going to use the money dishonestly as required? And isn't that the question? Did he actually intend to use the money dishonestly? Or just sloppy bookkeeping? Well, the hearing board found that he did not intend to use the money, to take the money. Right. But our position is that that shouldn't be the test for dishonesty. But if he didn't intend, then what is it? It's knowledge that that money will be gone. It's knowledge that that money will be spent. And that's where scienter comes into it. Scienter is only knowledge of the nature of one's actions. And we certainly agree that 8.484 has a scienter requirement, but that scienter requirement is only knowledge. And if you look at the evidence in this case, how respondent treated his bank accounts, he knew that the bank accounts, that all his bank accounts, especially his IOLTA account, were subject to transfers in and out by himself or, more importantly, by his paralegal and his personal banker. And it got to the point where they didn't even check with him. If something was going on and it came to the personal banker's attention or his paralegal's attention that a client or someone involved in one of his business transactions needed a payment, they would move money and they would pay it. So it's our- Isn't this case a real jump from the cases that you cited for three-year suspension? This would really rise to a different level. No, it's not. The egregious conduct in those three cases that you cite is pretty egregious as opposed to this. Well, our contention is that this is an egregious case. I cited five cases in my brief, five three-year cases. All those cases had similarities with this case. First of all, all of them involved large amounts of money. The smallest amount was $25,000. The largest amount was $190,000. All of those cases were cases in which the conversion was found to have been dishonest. All of those cases were cases in which the converted funds were held by the attorney and away from the client for a substantial period of time, and you have that also here in the one year. And in all of those cases, conversely, there was mitigation offered by the attorneys. And in some instances, mitigation comparable to the mitigation here, character testimony, community service, pro bono work, things like that. Was there ever any time when the balance in all of the accounts had fallen below the $115,000? Pardon me? Was there ever a time when all of the accounts had a balance less- All of his? Had a balance less than the $115,000. Do you mean all of his Harris Bank accounts? Yes. You know, that's not in the record. We know from his testimony that he had a number of accounts. How do you distinguish this from Rosen? Well, Rosen was, first of all, Rosen was a case in which this Court held that overdraft protection meant that a conversion was not as bad as it otherwise might have been. And Mr. Rosen had overdraft protection. But I believe in the Elias case, this Court kind of withdrew from that position. What was your disposition, Rosen? Censure, I believe. I'm not quite sure. But- That brings up a question. What weight, if any, should be given to the Respondent's ability and intent at all times to pay the funds despite the conversion? Well, you mean to pay the funds back once they were converted? Right, right. Well, it's- I don't know that it's worth much. I cited in my brief that the name of the case escapes me now, but there was a recent discipline on consent case that this Court took and approved. And one of the- it was a conversion case. And one of the mitigating factors that was outlined in the consent petition was that the Respondent always had the financial wherewithal to pay the money over. And this Court approved the consent petition but stated in its order, we do so without agreeing with the consent petition's statement that it is mitigating the fact that he had this money to pay the money over. So it certainly makes it- it would be much worse as far as effect on the client if the Respondent didn't have the money. But the fact of the matter is, in this case, he didn't have the money himself. He had to go to a bank account at another bank in which he was not the sole owner and pull $70,000 out of that account to pay Ms. Fishman. Now, his partner testified that that was fine with him, but he did not have- you would think that if he would have had the money in any of his accounts at Harris Bank, he would have amassed the money and paid. Mr. Splitt, I understand that you certainly disagree with Respondent's argument that his ability to pay Julie Fishman militates against a finding of dishonesty. I think you say that that misses the point and you think the conversion was complete when the funds were open- or funds were spent, rather. My question is, is that- did the hearing board and the review board hang their hat on that? We've heard a couple of questions about the ability of him to pay. Did both the hearing board and the review board hang their hat on the fact that the Respondent had the ability to pay and since he had the ability to pay, there was therefore no dishonesty? Or did they hang their hat on that plus others or other factors? The hearing board said that it found credible Respondent's testimony that he didn't intend to steal the funds. And the hearing board also said that because of the way that he didn't keep his books, the hearing board said this was a case of sloppy bookkeeping versus an intent to take the money. And I believe that you can read that as the hearing board filtering that I have the money if I need to pay it back into that. But from our perspective, as you said, it misses the point. It's really a question of will this court make clear what the administrator believes has been at least hinted at or better than that in a lot of the case law, which is if an attorney agrees to hold money for a client and does so in a manner that he has no idea what happens to that money and in fact the probability is that that money is going to be gone. But that is a dishonest act in and of itself. That's what happened in Belgrade. That's what happened in Hupka, cases that were approved and confirmed by this court. And that's exactly what happened here. Respondent, he had no intention of keeping track of that money. Respondent testified that his idea of holding the money was, quote, when it had to be paid, it would be paid, close quote. That's not how you hold escrow funds for someone else. You are under a fiduciary duty under Rule 1.15, under general fiduciary duties to take that money, put it in a trust account, monitor it, make sure that it's not being commingled, make sure that it's not being spent, and pay it over when it's time to pay it over. And the administrator has taken the position for years and years that if an attorney says, oh, I'll hold this money, and then his idea of holding the money is I'm not going to pay attention to it, and once it's due, I'll be able to come up with that. That is not only conversion, but that is a dishonest abdication of the attorney's fiduciary obligations as set out in Rule 1.15. But isn't that the question of what is dishonesty? I mean, the definition of dishonesty versus just sloppy bookkeeping, not that he intended to be dishonest about it. Well, the way we view it is we think it's the difference between dishonesty and fraud. Rule 8.484 is stated in the disjunctive. It's deceit, fraud, misrepresentation, deceit, dishonesty, misrepresentation, or fraud. So the idea is that these are not identical concepts. If an attorney intends to steal money, that attorney fraudulently converts the money from the get-go. I'll take this money for you, and if the attorney's intention is I'm taking this money and I'm leaving town or I'm buying a Porsche or something, that's fraudulent conversion. But if an attorney takes money under a situation where, as here, he knows that that money is going to disappear or in all likelihood that money is going to disappear, and he doesn't do anything to stop it, and his idea is, well, I'll just pay it out of my funds when it's time to pay it, that that is an inherently dishonest act. It's not fraud, but it doesn't have to be fraud. It's dishonest. It's a lack of honesty in dealing with the people who give you the money, whose expectation when they give you the money is that you are going to abide by your fiduciary duties, that you are going to abide by Rule 1.15 and put it in an account and balance that account and protect those funds. If we should agree that with your definition, then I think this is another question, is the level of discipline the same in both cases where an attorney intends to convert the money for his own use and not pay it back as to a situation that seems to be here where there may be money in other accounts and always the intent to pay it back? Should we treat them the same as far as the level of discipline? No. I think a fraudulent conversion, meaning the attorney takes the money with an intent to steal it, is the worst kind of conversion and deserves the highest level of discipline. And then as you move down the conversion spectrum, you move to cases like this where we contend there is a dishonest conversion based on this abdication of rights. That's not as bad as a fraudulent conversion, and the sanctions should be lesser. You're saying, and I think Justice Garmon used the word earlier in the discussion here, recklessness, right? There was a recklessness here. You can use recklessness, conscious indifference. But it didn't rise to the level of fraudulent conversion. Exactly. It did not rise to the level of an intent to steal, if you want to put it that way. Give us an example, just a quick example, of what the difference would be in a sloppy bookkeeping. What type of error is in a sloppy bookkeeping case that would not rise to the level of recklessness? Well, you can have an attorney who, and I gave this example in my brief, an attorney who walks into the bank thinking he knows his various account numbers and he needs a couple hundred dollars to go do something. So he takes a withdrawal slip, a bank withdrawal slip, makes a withdrawal from his client trust account thinking that he's doing so out of his personal account because he forgets the number and mistransposes it, and he gets the money. And there's a conversion right at that point, absolutely. But then, you know, the next week or so, his bank statement's come. He sits down. He looks at them, says to himself, oh, my gosh, I took that money from my client's trust account. I didn't mean to do that. He goes and he puts money back. That would be a conversion, absolutely, but that's a mistake. And we're not trying to say that any time an attorney makes a mistake in bookkeeping that that's dishonest. There has to be a level of conscious indifference to the attorney's obligations in order to raise that to a level of dishonesty. And in our estimation, the evidence shows that in this case. And in the example you just gave, I think you probably think a seminar on professionalism and office management with a shorter duration would suffice. In this case, those same professionalism and office management cases would unlikely cure the problem here. Is that correct? Well, it's hard to say. Professionalism cases can often do some good. The review board did not recommend one. In this case, we're not taking issue with that. The hearing board did, right? The hearing board did. The review board did not. Based on the testimony of the respondent that he essentially had improved his recordkeeping and didn't even use the IOLTA account anymore. So are you stuck on the three years or a shorter sanction with the office management situation? Well, we're not stuck on three years. We believe that the precedent supports a three-year suspension. When you look at the amount of money converted, the time that it was held, the delay in paying it back, and the fact that the person who was injured from this was a mother with two young daughters who, while she was awaiting the funds, was borrowing money from her mother to support her family. Didn't the injury occur because of the court proceedings and the delay in the court proceedings, not as a result of the money? Well, the respondent should have paid the funds back beginning in August of 2006. That's when the trial judge entered a final order saying these funds belong to Julie Fishman. Did they appeal? Well, Julie appealed, but she didn't appeal on that issue. And there was no stay of that order. There was no appeal bond put up. And so from our position, respondents should have paid over the funds after that time or that he should have at least paid over the undisputed portion, which I believe was about $30,000. Thank you. Was the money borrowed after Mrs. Fishman, after the August date when the court ordered transfer? Was the money borrowed? You said she needed to borrow money? My understanding is, yes, that she was borrowing kind of throughout the proceedings. But, you know, she thought after the August 16th order that the money would be coming to her, and it was at this point that respondent did not pay it over. Thank you. Counsel? May it please the Court? My name is Mark Mulrow, and I am the respondent in this matter. I think the issues here do reflect to what the facts and the circumstances that were surrounding this occurrence and that they can't be viewed just in the matter of the fact that there was a conversion or if there wasn't. The fact that there was a conversion was admitted immediately upon notification from the ARDC that some complaint has been filed. And, in fact, when the Review Board took on this matter and was considering this, it was brought up in there that it was not a matter of whether there was a dispute as to a misconduct, but it was to the legal conclusion of that conduct. What were the facts and circumstances that surrounded that conduct, and what would be the appropriate actions? In essence, it was taking a look at what was a sanction, because there was no question that there was a conversion made at the time. Counsel stated some of the facts. I don't think the facts are stated in full, or are they completely accurate as to what had happened. Prior to accepting any funds from Ms. Fishman, yes, I did have an IOLTA account. It was established actually based on the thought that I was supposed to have one. I really wasn't involved in setting it up. I told my secretary to set it up. I was out of town at the time it happened. And, yes, I did use that account as it was sitting dormant to park funds, place funds as they came in from various of my own activities. What do you think the purpose of the IOLTA account was? The purpose of the IOLTA account is to hold money. It should be to hold money for your clients. It should be to hold money in escrow. It should be separate from your accounts. Is that what you know now, or is that what you knew at the time that you set it up? At the time when it was set up, it was just she called and said, you have to have a separate account for IOLTA, and it's on the back of your registration. And to be honest with you, I wasn't paying much attention to it. I was out of town, and I set it up. Is it incumbent upon an attorney who agrees to hold funds for a client to inform himself of the requirements for proper safeguarding of client funds? Yes. Yes, and I don't disagree with that. I don't disagree that it was not properly done, and I don't disagree that there was a mistake made. I disagree as to the facts and circumstance that came up about that. And the overall, what my intent was, what my center was, what my knowledge was, as to the time that the funds were deposited into that account. At the time when this deposit was made, I was not even involved in the deposit. It was handled between Mr. Sherwell, who was Ms. Fishman's prior attorney, transferred the account from a Harris account to a Harris account that I had, and he got that information from my secretary. The other account that we use from the standpoint of our own transactions, yes, it was used to park funds. And testimony was given by Harris Bank Vice President Roy Gibson that prior to, during, and up until the time that I received the letter of the IRDC, is that all the accounts that I held for various businesses were held within that institution, and that there was the authority to move money if an account needed money around. And it wasn't that I abdicated the bookkeeping of it, I just didn't keep specific accounting on those accounts. I obviously had to keep track of those accounts to do taxes and to come in to reconcile accounts afterwards. But at the period of time where these money before, during, and after, I always had a knowledge of generally what was in the accounts and how much money was available. The testimony given by Roy Gibson is that at no time prior to, during, or after, were there not sufficient funds within that Harris Bank of accounts that would have been able to pay these funds off. The fact that I transferred money from another account, I don't know what relevance it has. Testimony was given that there were always the funds within that family, if you will, of accounts to make any payments that were necessary. Is that a proper use of an IHLTS account? No. I mean, that was clearly stated from the very beginning. But the question was, was there an intent to deprive Ms. Fishman of her money? Was there an intent to use that for my own purposes? Counsel in his brief indicated that, you know, the information given by Mr. Gibson, the vice president of the bank, was to somehow sort of assert that if you have funds available and if you financially have the wherewithal and you're fortunate enough to have money, that the court should not find dishonesty because, you know, I can pull it out of somewhere else to pay the funds. That is not why that testimony was offered. The testimony was offered was there was never any need for the Fishman funds, that it was not done with a dishonest intent to take funds with her. It was just done without paying attention to where the funds were. There were always funds within those accounts that were moved around by either Mr. Gibson or my office manager at the time to cover any obligations that were had. But the money was used for your own purposes. Pardon? The money was used for your purposes. Yes, it was used for my own purpose, but it was absolutely not needed for those purposes. They could have easily taken money from one of the other accounts and put it into that account or funded the other account. I could have taken this whole thing out by saying, don't touch that account anymore because I have somebody else's money in there, and I didn't. I could have. Let's stop there. There was $113,000 that eventually Julie Fishman was entitled to, is that right? Correct. All right. You said, did you tell anyone that there always has to be $113,000 in this family of accounts? No, I didn't tell anybody. It was something that I knew because I knew that money was not mine. Was there the possibility that since this was used, what were these accounts used for? Office expenses, whatever? It could be office expenses. It could be some of the transactions. The businesses that the council has indicated are on emergency homeless shelters and recovery housing. So on some of those, we may have been refurbishing a recovery home, or we may have been supporting a homeless program in time if we didn't get the funds. In all time, since these funds were to be put in escrow and in ULTA, were you at all times aware that there was over $113,000 in the family of accounts? Yes. At the Harris Bank alone, there was far in excess of that availability. And at other banks, which council referred to, there was even an additional $470,000 in that account. So, I mean, I was always aware of our cash position and where it was needed. With all your business transactions, was there ever the possibility that the accounts would go down below $113,000? No. I mean, is there the possibility? There's always a possibility. In my frame of reference, was there, based on the budget set we had, based on the obligations that I knew were outstanding, based on the obligations I knew were coming? No. There was sufficient funds. There were always sufficient funds there to pay those funds to Ms. Fishman. Mr. Milrow, what about the delay that opposing counsel described that Ms. Fishman suffered prejudice as a result of not receiving the funds? Well, there's a couple things that factually are incorrect on that. In the delay, yes, the final order was issued in August of 2006. Immediately in the court, which was testimony that was provided at my hearing, was that Ms. Fishman advised me, walking out of there, that she was appealing the entire findings of the judge, which were not specifically limited to child support issues. They also included the escrow account. They included the other funds that were to be distributed. Mr. Fishman also advised me that he was immediately going to be appealing this issue. So before I walked out of the court, I was advised that both parties were, in fact, appealing it. And this was a very litigious event. I did not come into this event until towards the very end. Did it as a pro bono because Mr. Fishman lost his attorney and could not afford counsel, and he was a friend of mine, and I knew him, so I ended up taking it on at that time. So at that point in time, before we even left Judge Bitar's courtroom, I was advised that both parties were appealing it. And this was subject to other, it was sort of a history of the litigation that went on. They appealed modification of the initial order. So I assumed that she was going to appeal it. She generally followed through with what she said she was going to do. Was there a stay order ever in place? There was never a stay order in place. So did you make any attempt to bring to the attention of the court and ask for directions on what you were to do with this money? When we were in the court on the matter prior to walking out of the court, there was a brief comment with Judge Bitar, but it wasn't reflected in any of the records. I mean, it was just he put an order saying distribute the money within three days, and I asked him, well, both parties are going to have a 30-day appeal. He said, you figure it out. You know how it works internally. But that really wasn't in the record. Mr. Mulroney, you've indicated there was more than enough money to satisfy the $113,000. That $113,000 at one time was in the IOLTA account. Yes, that's where it was shifted from. And that's what I'm getting at. What motivated the shift? You told the court that you knew you had to have an IOLTA account. You told Justice Garmon that you had a responsibility basically to know what it's for. There's $113,000 in an IOLTA account. You mentioned $470,000. You have this money that you say you have a mental note that one day may be, well, was going to be due to one of the parties in the divorce proceeding. What was the motivation to transfer it out of the IOLTA account? There actually was no motivation involved, and that's part of the failure. So one day you woke up and said, I'm just going to transfer these monies? No, the fact is I never made that active decision. When it was agreed, when it was finally agreed that the funds would transfer, I don't think it even happened for another 30 days until after that. When it was originally asked to hold, I just said no. I don't hold funds. And it was one of these persistent things in the court, and finally I just said fine, whatever. Just contact Denise. Thirty days later, Mr. Sherwell contacted my office manager, got an account, because the funds were in a, I guess at that time they were in an actual trust account, which he could have just switched trustees. We could have done so many different things. He actually took the money out, deposited it into my IOLTA account, because that's the number that Denise gave him. So at that point in time, I really was not aware that there was $113,000 of somebody else's money. Did I become aware that that money did transfer later? Yeah, I was later told that, oh, yeah, the transfer was made. And at that time I should have said, make sure, keep it separate, put it somewhere else. And my question is only, why did it get moved? From the IOLTA account? Yeah, into the family of accounts. It really didn't get moved, because the history from those accounts with the bank. Am I wrong? I mean, the money that came to Denise or whatever, that money was put in the IOLTA account, right? Right. The reason we're here today is because at some point that money got out of the IOLTA account. Correct. And it went into your family of accounts. No, it went probably into the operation account that paid a check, that paid something. Who made that decision? That would have been Roy Gibson would have had the authority to do that, the banker, or also Denise would have had the authority to. Well, the banker doesn't say, I think I should take this money out of this account and put it in this account. No, the banker had the authority within the family accounts. The reason why we used the IOLTA account, and, again, I acknowledge that this is not a correct use of the account. Prior to taking this money in, the banker did have the authority that if we were doing something, rather than putting it directly into an account somewhere else, they put it into the IOLTA account because it wasn't income, it wasn't an investment. It sort of created the spot where it was distributed from so that we could track it at a later date. So you had monies in the IOLTA account that had nothing to do with any lawsuits at some period of time. I'm not talking about this. Before, during, and after. In fact, during the period of time, one of the things that is not reflected or was not reflected in the facts given by counsel for the administrator, that sometimes even after this, the account balance exceeded over $300,000. I had a monthly ending balance of $174,000. There were times where the money was in far excess of even the $113,000 that was there. The issue is that I did not properly segregate and manage those accounts. And I acknowledge it. But it wasn't done with the intent or wasn't done with the knowledge. There must be some reason, though, that Denise under your direction or the banker under your direction or somebody under your direction moved money from the IOLTA account to another account. Because the operating account, which was funding some of these items, would run down and they just swept from there. Then they would replenish from one of the other accounts, depending on where the money was spent. Now we're getting there. If there was a need to pay something that was paid out of the other accounts that you had checks for, the money was moved. Correct. And that's why you said earlier that there was the chance that the accounts could, although they didn't, go below the $113,000. Yes, that is correct. Is that reckless? I guess it's not responsible. I view reckless as something that is done with an intent. This was not done with that intent, to be reckless. From my standpoint, from where I was operating, I always knew the funds. There was never any question in my mind that those funds were not available. In fact, I was asked, they said, well, did you want, I said, I was obviously going to pay. Whenever it was required to be paid, I would pay. But those funds would just flow in, and it wasn't the appropriate use of that account. But, no, I guess reckless is that if I were essentially using it to fund other obligations because I didn't have the funds there and hoping I would get funds back to replace it. I'm interested in this banker situation. Did Denise just send the bills to the banker to pay out of the account that you had? No, generally she would cut the checks as they would come in. Our CFO from our other organizations might say, we have this coming up, we have this, and she would say, fine. She would cut the check. She would notify him, I've got a check going in, and he would move the money. Did you know what the amounts of all the bills were coming in? Yes. They were not done, the payment of the bills were not done without my authority or my knowledge. Nobody had the ability to write themselves a check for $100,000. I always knew what they were. Again, it's not a question of whether, it's just that the account was not used properly, it was not segregated. Was it a pass-through account, is that what you're calling it? Generally, that's how we used it. What's the difference between what happened, what you did here, and the situation where the lawyer that has the trust account, some bill comes up to be paid and he's a little short. You know, I'm going to get another fee this week. I'll just take this out of this. I'll just take it out of the trust account and pay this today, and I'm going to put it back. I mean, virtually, pretty much all say that. I didn't really intend to take it. I didn't intend to steal it. What is the difference? I think the difference is that it is an intent. I mean, if I have an obligation that I'm supposed to pay somebody $10, and I don't have $10, and I take it off of your desk and say, don't worry, I'm going to put it back, and you have no knowledge of it, and you have nothing there, then, you know, you're hoping that you can pay that back. And you may have good intentions to pay that back, but an occurrence can be that you didn't pay it back. I think it is a little difference, and it is distinguished between the fact that if I have five pots of $10 and somebody says, I need $10, and I just grab this over here and give it to you, and it's yours, I say, oh, I've got to put that back, and over there, and I have it there. I think it's the frame of mind of how you are. Are you borrowing that money with the intent to pay it back, or is it just that it was in a convenient place? It really gets down to, because even from the standpoint of my feelings on this, I did not handle that account correctly. I brought this all on myself. I mean, I can't blame Denise. I can't blame the banker. I can't blame Ms. Fishman. I'm the one who did it. I did not follow the rules as they should have been done. But they were not done with any intent to deprive Ms. Fishman of her money. They were not done with the intent to borrow that money. The testimony was heard. It was always the money in the accounts, in the family accounts, that were readily available to take that money. So what should the sanction be? Well, the sanction, I think that's a matter of what the facts and circumstances are, and they do come in and look at what these facts presented to the court or to the hearing board. One of the issues that came into it was, was there the intent to deprive her of her money? The delay that was discussed, Justice, you had asked that, and I don't think we fully answered that, or we sort of got sidetracked. The delay at the point is that once that time period ran, that September 30th, and Julie Fishman had a note on my desk that day, we started talking about, okay, this is what I have in the account, and the testimony shows that she kept demanding more money than was in that account, more money than was even transferred, because she was basing it off of early orders. And there was a problem of getting her to agree as to what the amount was. Retrospect, I should have just sent out the check and let her sue me or figure out what to do with it later. It was not the intent to delay that payment. It was the intent to get the amount, too. Even in the motion to compel, the one issue she lost on that the judge said, no, I did not rule that. The second one he said, no, you've got to go back and figure out what the amount is. It's not the amount that you're saying, but go figure out what the amount is. How does the post-data check at the end fit into all that? The post-data check was done from the standpoint, this was over a period, the delay period was from the Friday until the Wednesday when she actually got the money. On the Friday when we were in court, the judge said, go back and do this now. And I said, let's go back to my office, we'll take care of this right now. She did not come. We made some arrangements to come together on the second day, on the Saturday. We both disagree as to why we did not meet on that day. Every time I gave her was unavailable. We're only talking about four or five days, aren't we? Correct. On the Sunday night, I called her up and said, I'm just going to drop off. I was working that night, so I'll just drop off a check. Can we agree on the amount? Show me what you think it is. So on the Monday morning, because it was late when I finished up, I dropped off a check. With that check, I did a complete calculation, and I calculated the interest to Wednesday. I said, please review what I've done, let me know if you agree or you disagree or what the situation is, and we'll transfer the money then. That was in my operating account. I believe at the period of time I just transferred $151,000 into the IOLTA account. So, yes, the operating account didn't have money, but $151,000 was transferred into the IOLTA account, and, yes, I believe I did transfer it from another account. So the purpose was, at every stage of the game, there was an argument about the money. At the time when we were trying to calculate, she was demanding a payment of $146,000. $113,000 was deposited into my account. We constantly argued about this, trying to get to the issue. So I sent that with the complete calculation with the interest included for the additional days. When I finally did get a response from her on Tuesday, and she said, fine, this is the amount, can you wire transfer it, I immediately arranged for a wire transfer. So it wasn't a question of whether the funds were going to go or not. I was so happy just to get rid of them, I made every effort that I could. So I did arrange for a wire transfer. I didn't even require her to bring the check back. She immediately tried to deposit the check the next day after receiving the wire transfer. So it was a very contentious situation. Another factor that I do want to clarify is that, and it goes to Justice's question about the sanction, which I will get back to, is that when Ms. Fishman testified to this time period of financial hardship and loan, it was two years prior to my even being involved. I think I outlined that in the brief. She was testifying to she was borrowing money from her mother to buy a house, which she described as Section 8, which wasn't Section 8. And that occurred two years prior to my even having the account or the money or anything else. I'm not saying that anybody being delayed any amount of time is not a factor that should be considered. But I think in the mitigating factors, it wasn't as, you know, that she was destitute on the street and borrowing money at the time period that I was holding this money and the time period of the delay of that money. That period occurred two years prior to, and I think that was actually brought out in the hearing. And it's also in my brief. What would have happened if a bill came in the door? You held the money for a year, right? November to November? Yes. What would have happened if a bill came in the door in that year that would have dropped the account below the $113,000? I'm assuming you're assuming the family accounts or just this account? Well, this account didn't have it in it. So that happened. I'm talking about the family accounts. What if a bill came in the door that dropped your family of accounts that you were contemplating using to pay what was to be held in escrow and the AOLTO account? Would you have paid the bill? No, not if I didn't have the funds to do it. So if there were not funds to do it, I wouldn't authorize a payment that would take the balances down to funds that were not mine. I don't believe I need to. Your time has expired, but if you have a short wrap-up. It's not short. It's just as far as the mitigating factors. I think these are different mitigating factors. There was an intent to deprive Ms. Fishman of the money, and there was an intent to do anything dishonest, and I think those are factual based on the circumstances. I think the court defers to the hearing board as listening to all the facts and circumstances. I did present that I have substantial pro bono activities. This was discounted in the administrator's brief, saying, well, yeah, but 80% is your business. In the hearing, it indicated that 80% of my business operates emergency homeless shelters and recovery homes, which I do a lot of pro bono for. So that 80%, which doesn't even reflect the law firm, is a substantial amount. I am actively involved in my community. Like in my C.O.D. Mr. Morrell, I think all that's in the record and in your arguments. Is there something you want to conclude with? Yes. I mean, on a personal note, I brought this embarrassment on myself. I brought this ‑‑ I mean, essentially, there are so many things that could have been done differently, should have been done differently. They weren't with the intent to be dishonest. They weren't with the intent to defraud anybody of their money. If it were a simple case of taking a look at the dollar amount and forgetting all the facts and circumstances, four years ago, that could have been resolved. This has been on my mind every day for four years. And I realize that that's anybody who's involved in one of these matters and anybody who's ‑‑ I never thought I'd appear before this court defending myself, ever, in my entire life. But those are the facts. I think my mitigation does not ‑‑ my mitigation does provide for sanction far less than what was been suggested by the administrator. I think my value to the pro bono community is valuable. The people that I serve will lose an advocate. I give that time freely. I don't take it into disrespect. I think that from the standpoint of just saying that somebody is not ‑‑ because I made corrections and because I started to make corrections as soon as I found out that I'm not somebody who's valuable for probation or for the court to send the message saying what you did was wrong, you need to learn from it and be aware of it, I think is unfair because then we're sending the message out, don't correct it because you're almost hurting yourself if you do. Thank you, Mr. Milne. Thank you. Just a few points on rebuttal, Your Honors. Mr. Nimoy. Mr. Split. Yes. You cited Nimoy and Campbell. Yes. Both of those cases were one‑year suspensions, one with a three‑month ‑‑ last three months stayed by probation and one stayed after six months by a period of probation. That's correct. You're asking for three years. We are. Those were smaller amounts of money in those cases. In Nimoy, the conversions were accomplished in such a short period of time. There were a lot of them. But the clients never even knew the funds were converted. The bank records showed. So there wasn't damage to the client like there was in this case. The amounts of money weren't the same. The delay wasn't the same. We were asking for more in both of those cases. The delay was four to five days? No, well, Your Honor, we disagree. And here's the upshot there. Respondent was charged with not promptly paying over the funds. Respondent admitted that allegation. So the amount of evidence at the hearing on the exact delay was slight. The hearing board in its decision found a violation, found that the funds were not paid over promptly, but did not say when it thought the delay started and when it ended. And was the prejudice to Julie two years before when she was borrowing money and not during the time? Well, no, not necessarily. And there's a disagreement between Respondent and myself about that. Is it in the record? 178 to 188 in the transcript is where Julie Fishman talks about borrowing money and being injured by the fact that she could not get this money in a timely fashion from Respondent. She does carry over a wider area of time, but I believe her testimony is specific that after August when the court awarded me the funds and Respondent was not paying them to me, I had to borrow from my mother. The Section 8 apartment was a different time, but borrowing from her mother and her testimony that she really needed this money, it's my recollection that it was during this delay period. And the delay period, Respondent now wants to try to crush that delay down to a very small period of time, but he didn't take the attack before the hearing board. He did not challenge or offer evidence as to that allegation of misconduct. He admitted. And so as a result, we're left with a hearing board report that is less than specific about the delay, but the fact of the matter is that there was a finding that he did not promptly pay these funds over, and Julie Fishman testified that she was trying to get the funds from Respondent from August until November. And so that's the evidence. And during that period from August to November, was there a dispute on the amount that was due? There was, at least as to some of it. A portion of the funds that about $30,000 was owed to Julie was undisputed, even with regard to Adam, her husband. But certainly when it came down to the amount of interest, Julie was claiming $120,000, $130,000. So Respondent could have clearly paid over the $115,000, and then they could have disputed the excess, but Respondent didn't do that. So my second point is that we disagree strongly with Respondent's claim that his family accounts at Harris always had the money. The evidence doesn't support that. The evidence shows that when he wrote the check on his operating account, he took $70,000 of that money from a different bank, not a Harris bank, a different bank, an account that he owned with Brian Rowland. Now there was testimony that Roy Gibson testified, his personal banker, testified that at no time during the time that Respondent was holding the funds would, what he said was there was no time when a check wouldn't have cleared for $115,000. But from our perspective, that's not saying that you have the money. That's saying that you have a relationship with your bank such that the bank will make that check good and come to you for whatever is missing in that check. So the evidence is that the Harris family of accounts did not have the money when he needed to pay the money back. And finally, recklessness, the issue of recklessness came up. Justice Thomas, I believe this was reckless. Recklessness is conscious disregard for injurious consequences that are either known or should be known to a reasonable person. And the way that Respondent just now described his IOLTA account was that he put money in it and then when his operating account went down, the money would be swept out of the IOLTA account into the operating account until that was spent down and it would be swept. That is not how you hold money. You know when you put money into an IOLTA account that functions like that, that that money is going to be gone. And indeed, $40,000 in 18 days, virtually all of it in four months, and from our perspective, this Court should say that an attorney is not entitled to treat his client's funds like that. And if he does so, then he acts dishonestly. Thank you. Thank you. Case number 111378, Enrique Mark Gerard Moreau, will be taken under advisement as Agenda Number 7.